Argued and submitted May 28, 2014, reversed and remanded November 4, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HERBERT LEE SCRUGGS, JR.,
*Defendant-Appellant.*

Multnomah County Circuit Court
111134651; A151176

362 P3d 265

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Douglas F. Zier, Assistant Attorney General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Defendant appeals a judgment of conviction for unlawful delivery of cocaine within 1,000 feet of a school, ORS 475.882, unlawful delivery of cocaine, ORS 475.880, and unlawful possession of cocaine, ORS 475.884. He assigns error to the trial court's (1) denial of his motion to suppress evidence under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, and (2) failure to merge his convictions for unlawful delivery of cocaine within 1,000 feet of a school and unlawful delivery of cocaine. Defendant argues that the warrantless search to which he was subjected—in which officers ordered him to strip naked, handcuffed him, and forcibly bent him over and spread his buttocks to discover drugs—was unlawful. The trial court ruled that the search was not allowable as a search incident to arrest because it was not reasonable in time, scope, or intensity, but nevertheless determined that the fruits of the search would inevitably have been discovered at the county jail by means of an administrative detainer to which defendant was subject for a parole violation. The state concedes that, as to the inevitable discovery exception to the warrant requirement, it did not meet its burden of showing "certain proper and predictable investigatory procedures" would have been utilized and, thus, the evidence cannot be suppressed on that basis. By cross-assignment, the state challenges the ruling that the search was not allowable as a search incident to arrest. Because we agree with the state and accept its concession as to inevitable discovery and conclude that the warrantless search was not allowable as a search incident to arrest, we reverse and remand.[1]

We review the trial court's denial of a motion to suppress for legal error, and "are bound by the trial court's findings of historical fact that are supported by evidence in the record." *State v. Holdorf,* 355 Or 812, 814, 333 P3d 982 (2014). Moreover, "if the trial court did not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we

[1] Our disposition obviates the need to reach defendant's merger argument, which, in any event, is conceded by the state.

will presume that the trial court found facts in a manner consistent with its ultimate conclusion." *State v. Stevens*, 311 Or 119, 126-27, 806 P2d 92 (1991) (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). "Our function is to decide whether the trial court applied legal principles correctly to those facts." *Id.* at 126 (citing *State v. Peller*, 287 Or 255, 260, 598 P2d 684 (1979)).

At around 5:00 a.m., in the Old Town area of Portland, Officers Sparks and Wells were on a "spotting mission"; from an unmarked car, they surveilled the area for possible drug transactions. Police officers and drug users knew the area as "Crack Alley," where drug deals and use frequently occurred. Sparks saw (through binoculars) defendant make contact with a small group of known drug users who were standing on a corner. He observed defendant talk to one of them, then reach down inside the front of his pants, dig around, pull out his hand, open the palm, inspect what he had retrieved, receive a paper-like object (which Sparks believed to be money) from the person, and hand the person a small object—all actions that Sparks interpreted to be a hand-to-hand drug transaction. After Sparks observed what appeared to be another hand-to-hand drug transaction between defendant and another person, he called in other officers to make contact with defendant and, as the officers drove to the scene, defendant ran. Within a few minutes, Officer Ajir apprehended and arrested defendant and then searched his pockets; he found cash but no drugs. Before the contact and arrest, defendant had briefly left Sparks's sight, but when defendant returned to his view, Sparks observed nothing to indicate that defendant had tossed or swallowed anything.

Nevertheless, the officers believed that defendant still had drugs concealed on his person, and, in accordance with police department policy that prohibits conducting strip searches on the street, Ajir transported defendant to the local precinct station to conduct what he described as a "more intrusive search." The officers believed that was necessary because, in their experience, it is common for drug dealers in Old Town to hide drugs inside their anal cavities—a practice known as "keistering"—or pressed between their buttock cheeks. At the station, officers placed

defendant in a private room. Wells instructed defendant to remove his outer clothing and then went through each item of clothing to check for hidden pockets or tears where defendant could have hidden drugs. Wells then instructed defendant to remove his underwear and ordered him to bend over, to use his own hands to spread apart his buttock cheeks, and to cough so that Wells could see if there were drugs inside defendant's anus. Defendant bent over, but only at a 45-degree angle, grabbed his buttock cheeks and "halfheartedly" spread them (but not to the point that Wells could observe anything), coughed, and then quickly stood back up. Those actions led Wells to believe that defendant was concealing something deeper inside his buttocks.

Wells proceeded to handcuff defendant and, with the help of Sparks and another officer, physically bent defendant over. Wells saw that defendant was clenching his buttocks together, and Wells proceeded to physically and forcibly spread them open. The officers then spotted a plastic baggie pressed against, but not inside, defendant's anus. Since "[n]o portion of the bag was technically inside of" defendant, Wells "pulled out" the bag, which contained cocaine. Wells testified that it was the police department's policy that, if the bag had been "in any way, shape, or form internalized, for lack of a better term, then at that point in time we're going to stop and then go the route of a warrant. * * * Because obviously that's about as intrusive a search as you're going to get." Defendant was then allowed to put his clothes back on. The police delivered defendant to the county jail to be booked on charges of delivery and possession of controlled substances, and on a no-bail probation violation detainer.

The explanation for the detainer is that the officers learned that defendant was on probation and contacted his probation officer. Wells testified that, if the officers had not discovered the drugs, they would nevertheless have called defendant's probation officer to alert him of the hand-to-hand drug transactions they had observed defendant making in Old Town. The police did, in fact, make such a call and spoke with Desmond, the probation office's supervisor. Defendant had recently been released from jail and had failed to report to his probation officer; consequently, Desmond issued an

administrative detainer for defendant, which was a no-bail hold on his release. Desmond testified that, if the officers had reported to her that they had not discovered drugs on defendant but had observed a hand-to-hand transaction in Old Town at 5:00 a.m., she would nevertheless have asked the jail to hold defendant without bail on an administrative detainer.

Sergeant Morrison, the classification unit manager at the Multnomah County Jail who handles inmate housing assignments, testified about who is subject to strip searches when they are booked into the jail's custody. Morrison stated that it is a "fairly broad policy," which, as relevant here, includes (1) those who are entering the jail because of a drug offense; (2) persons whom the arresting officer indicates are concealing contraband; and (3) persons who will be held in the jail overnight on a parole violation detainer. Morrison noted that the classification deputies did not perform strip searches; those were done in the reception area by the booking deputies based on information received from the arresting officer. Morrison stated that the policy to which he was referring for his testimony was Sheriff's Office Special Order 03-08. The state, however, did not introduce a copy of the policy into evidence during trial.

Morrison also described the strip-search process. According to Morrison, an inmate is directed to undress in a private stall in view of the strip-searching deputy. The inmate's clothing is put in a property bag and handed to the deputy. The deputy directs the inmate, among other things, to bend over at the waist, spread his buttock cheeks with his hands, and cough forcefully. When asked what happens if an inmate does not comply with that direction, Morrison replied that it was against policy for the deputies to physically bend over or maneuver the inmate. Instead, the inmate is handcuffed and put into a dry cell—a room without a toilet or any other place where contraband can be hidden. If necessary, the deputies will obtain a warrant and send the inmate to the hospital to have medical personnel determine if the inmate has stored contraband internally.

In response to defendant's motion to suppress the evidence, the state argued, citing *State v. Caraher*, 293 Or

741, 653 P2d 942 (1982), that the reason for the allowance of searches incident to arrest is that the search is "relevant to the crime for * * * which the defendant is being arrested. So under that component, it doesn't have to be an officer safety issue or a potential means of escape, but just has to be related to the crime itself." In response to defendant's argument that the officers did not have probable cause to arrest defendant, the court commented that, "given the totality of the circumstances, which is it's 5:00 a.m. in a well-known drug trafficking area and there's a gathering of people and conduct that appears to trained officers to be a hand-to-hand drug transaction. I think that establishes probable cause." Defendant countered that

> "a strip search, a cavity search, goes a little too far. * * * The broad latitude that's granted does have the limitation that it be reasonable in time, scope, and intensity.
>
> "* * * * *
>
> "And so it would be my argument that this intrusive level of search is not reasonable. It is violative of Article I, section 9, of the Oregon Constitution and the Fourth Amendment [to] the United States Constitution, and that means—what the officers would have to do to conduct this level of search is within their means. They could get a dry cell, get a warrant, and simply respect that boundary of [defendant's] privacy."

After hearing further arguments from the parties, the court added:

> "I am going to find that the search incident to arrest goes beyond what's reasonable in that context * * *. It's just based on a couple of things.
>
> "One is it is such a deep intrusion into somebody's privacy, and there really is no exigency. In fact, I think * * * Sergeant Morrison testified that law enforcement has a way with dealing with that circumstance, which is placing somebody in a holding cell where they can't ditch something, and then applying for and obtaining a warrant.
>
> "So given that there's no exigency in that circumstance, they have him detained. They could have placed him in a holding cell where he could get rid of the contraband or the

drugs in that case. I think it [under] Article I, section 9, * * * would require a warrant for that kind of search.

"That all being said, I think ultimately the record also leads me to a conclusion based on the preponderance of the evidence, that the drugs would have been discovered in the course of an appropriate procedure that would have been followed in the jail.

"And so based on the inevitable discovery doctrine, I'm going to deny the motion."

After the court's ruling, defendant waived his right to a jury and agreed to stipulated facts, preserving his right to challenge the court's denial of his motion to suppress.

We first address defendant's arguments in support of the trial court's ruling that the search was too intrusive to be a lawful search incident to arrest, which the state cross-assigns as error. He relies on both Article I, section 9, and the Fourth Amendment for his argument, that the search to which he was subjected was "dehumanizing and humiliating" and, thus, not reasonable in time, scope, or intensity. On appeal, the state reprises its argument made below, under *Caraher*, 293 Or 741, that the search was reasonably related to the crime for which defendant was arrested and that, although "a strip search is highly intrusive," it is "not as intrusive as an actual body-cavity search"; the particular search in this case "was within the permissible parameters of a search incident to arrest."

Our discussion begins with the search incident to arrest exception under the state constitution, and because Article I, section 9, is dispositive, we do not reach defendant's Fourth Amendment contention. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim."). Article I, section 9, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." "Evidence seized without a warrant or a constitutionally sufficient exception to the warrant requirement [must] be excluded," *State v. Johnson*, 177 Or App 244, 247, 35 P3d 1024 (2001), and it is the state's burden to show that an exception to the warrant requirement

exists, *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). A "search incident to lawful arrest" is a constitutionally sufficient exception and is authorized for three purposes: "(1) to protect a police officer's safety; (2) to prevent the destruction of evidence; or (3) to discover evidence of the crime of arrest." *State v. Mazzola*, 356 Or 804, 811, 345 P3d 804 (2015) (citing *State v. Hoskinson*, 320 Or 83, 86, 879 P2d 180 (1994)). Although on appeal, the state contends that the search was authorized by the second and third purposes, the state did not contend in the proceedings below that the search was authorized to prevent the destruction of evidence, and, accordingly, we only address whether the search was authorized to discover evidence of the crimes for which defendant was arrested.[2]

A search incident to arrest for the purpose of discovering evidence "is limited to a search for evidence of the crime for which the arrestee is arrested." *State v. Owens*, 302 Or 196, 200, 729 P2d 524 (1986). That is,

"[i]n order to justify a search, incidental to an arrest, the arrest must be for a crime, evidence of which reasonably could be concealed on the arrestee's person or in the belongings in his or her immediate possession at the time of the arrest. Thus, for example, if the person is arrested for a crime which ordinarily has neither instrumentalities nor fruits which could reasonably be concealed on the arrestee's person or in the belongings in his or her immediate possession, no warrantless search for evidence of that crime would be authorized as incident to that arrest."

*Id*. However, Oregon law recognizes that "a search incident to arrest may not be an exploratory search of everything in an arrestee's immediate possession." *Id*. (internal

---

[2] At trial, the state expressly indicated that the purpose of the search was to discover evidence relevant to the crime for which defendant was arrested. 274 Or App at 581. Had the state raised the contention that the purpose of the search incident to arrest was to prevent the destruction of evidence, the record might have developed differently. *See, e.g., State v. Hite*, 266 Or App 710, 726, 338 P3d 803 (2014). In particular, the state might have introduced evidence supporting its contention on appeal that, because utilizing a dry room would have been neither reasonable or effective, the trial court erred in concluding that there was no exigency. The state has the burden of proving the validity of the search. *See* ORS 133.693(4) ("Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution.").

quotation marks and brackets omitted). "[T]he particular circumstances must be examined to determine whether the search was reasonable in time, scope, and intensity." *State v. Burgholzer,* 185 Or App 254, 259, 59 P3d 582 (2002).

The state cites a number of cases for its argument that the search was reasonable in time, scope, and intensity. The state contends that defendant's drug possession and delivery offenses are the type of offenses for which the police has the authority to conduct a "thorough" search. *See State v. Spencer,* 92 Or App 459, 463-64, 758 P2d 885 (1988) (searches of a defendant's purse and car were justified as searches incident to arrest because drug evidence "could easily be concealed on [the] defendant's person or in her belongings"). Further, the state contends that the time and place of the search—which occurred 15 minutes after the arrest and was conducted at the precinct station away from the street where the arrest took place—was reasonable, citing *State v. Hernandez,* 199 Or App 566, 568-69, 113 P3d 437 (2005), in which we held that a delay of 20 to 30 minutes in searching the defendant's pocket knife and a small ball-shaped package for drugs at the police station (also the Old Town precinct station) was reasonable because it was "not good practice to open drugs on the street" and more appropriate to open the items in "a secure, controlled environment." Likewise, in the state's view, the delay in this case was necessary because the officers had to provide defendant privacy for the strip search. Moreover, the state argues that the scope of the search was reasonable because the area searched—defendant's body—was well within defendant's immediate control. *See State v. Kruchek,* 156 Or App 617, 624, 969 P2d 386 (1998) ("The scope of the search extends to personal effects within the immediate control of the arrested person." (Citing *Owens,* 302 Or at 200.)); *see also State v. Washington,* 265 Or App 532, 537, 335 P3d 877 (2014) ("A search is reasonable in scope and intensity if it is 'sufficiently close in space to the arrest'; that is, if it is confined to the area that was in the immediate control of the suspect at the time of the arrest and it extends only to places where evidence of the crime of arrest reasonably could be concealed." (Quoting *State v. Vaughn,* 92 Or App 73, 78, 757 P2d 441, *rev den,* 306 Or 661 (1988).)).

We understand the state's argument to be that the search here was constitutionally valid because it is consistent with our case law holding that the search of closed containers or personal effects in the course of a drug arrest is permissible; that, where the police officers reasonably believed that defendant had hidden drugs on his person by either "keistering" them or by placing them between his buttocks, conducting a strip search was reasonable and within the parameters of a search incident to arrest. The state concedes that, "without question," a strip search is "highly intrusive," although "not as intrusive as an actual body-cavity search." Put differently, the state implicitly advances the contention that hiding drugs between one's buttocks or inside one's anal cavity is akin to hiding something in a concealed container, and asserts that, even though such a strip search is "highly intrusive," it is nevertheless reasonable in time, scope, and intensity.

As noted, however, "the incidence of arrest 'does not justify an exploratory seizure of *everything* [in the arrestee's] immediate possession.'" *State v. Woodall*, 181 Or App 213, 219, 45 P3d 484 (2002) (quoting *Owens*, 302 at 196 (emphasis and brackets in *Woodall*)). Moreover, in *State v. Chinn*, 231 Or 259, 267, 373 P2d 392 (1962), the Supreme Court, in the course of establishing the reasonable time, scope, and intensity requirement for searches incident to arrest, stated that the "only practical test for reasonableness in relation to time and space is to examine the total factual situation in the light of the constitutional right of privacy."

Oregon case law has addressed what may be considered "reasonable in time, scope, or intensity" in the context of a search incident to arrest of a defendant's personal items or closed containers, but it has not considered that question in the context of strip or cavity searches. Still, in other contexts, we have emphasized that "[t]he final bastion of privacy is to be found in the area of human procreation and excretion" and, "[i]f a person is entitled to any shred of privacy, then it is to privacy as to these matters." *Sterling v. Cupp*, 44 Or App 755, 761, 607 P2d 206 (1980), *aff'd as modified*, 290 Or 611, 625 P2d 123 (1981) (considering the extent of the privacy right as to searches of inmates by opposite-sex correctional officers); *see also State v. Casconi,*

94 Or App 457, 766 P2d 397 (1988) (hidden and warrantless police surveillance of a doorless public restroom stall significantly impairs freedom from scrutiny and, thus, constitutes a search under Article I, section 9). Further, in *Mazzola*, the Supreme Court recently considered whether the warrantless administration of field sobriety tests (FSTs) in the course of investigating a DUII offense were justified as an exigent circumstance under Article I, section 9. Although a search incident to arrest was not argued as a basis for the FSTs, the court looked to the "reasonable time, scope, and intensity" constraint on searches incident to arrest to aid its analysis. 356 Or at 811-12. The court concluded that the FSTs were "limited in scope and intensity; they did not intrude into defendant's body." *Id.* at 820. Together, *Chinn*, *Sterling*, and *Mazzola* instruct that the requirement that a search incident to arrest be "reasonable in time, scope, and intensity" implicates the constitutional right to privacy and that that privacy right is particularly compromised when a search intrudes into a defendant's body, particularly the genital or anal areas.[3]

With that in mind, we reject the state's argument that, although the search was "highly intrusive," it was still within the reasonable parameters for a search incident to arrest. That is, we do not agree that the search, a physical intrusion of defendant's body, was comparable to a search of his clothing, personal items, or closed containers within his immediate control. The officers decided to bring defendant

---

[3] We observe that the Court of Appeals for the Ninth Circuit of the United States has commented that, with regard to the Fourth Amendment's protection against unreasonable searches and concerning a police department's policy of subjecting felony arrestees to visual body-cavity searches, "[t]he intrusiveness of a body-cavity search cannot be overstated. Strip searches involving the visual exploration of body cavities is dehumanizing and humiliating." *Kennedy v. L.A. Police Dept.*, 901 F2d 702, 711 (9th Cir 1989), *abrogated on other grounds by Hunter v. Bryant*, 502 US 224, 112 S Ct 534, 116 L Ed 2d 589 (1991) (per curiam). Similarly, in *Giles v. Ackerman*, 746 F2d 614, 616 (9th Cir 1984), *overruled on other grounds by Bull v. City and County of San Francisco*, 595 F3d 964 (9th Cir 2010), the Ninth Circuit reasoned that a warrantless strip search as a search incident to arrest was not allowed under *United States v. Robinson*, 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973), the United States Supreme Court decision that held that a "full search of the person" as an incident to arrest was not prohibited by the Fourth Amendment, noting that the search in *Robinson* was limited to a pat down and search of the defendant's pockets. *See also Fuller v. M.G. Jewelry*, 950 F2d 1437, 1446 (9th Cir 1991) (relying on *Giles*, a visual body cavity inspection not justified as a search incident to arrest).

to the Old Town precinct station to conduct a strip search because, as they described it, such a search is "more intrusive" and, thus, not appropriate for the street. We disagree with the state's assertion that the officers' decision was similar to the one in *Hernandez*, 199 Or App at 569, where officers brought items that may have contained drugs to the precinct station to open them in "a secure, controlled environment" because it was impractical to open them in the street; that search was not done at the station precinct for privacy reasons. The search incident to arrest exception for the purpose of discovering evidence is not unlimited—it does not extend to "everything [in the arrestee's] immediate possession," *Woodall*, 181 Or App at 219—and in the factual circumstances here of searching for evidence of drug possession, the search's scope and intensity were more intrusive than what is typically allowed for searches incident to arrest. Defendant was subjected to a search—a strip search and then the forcible manipulation of his body and his buttocks to locate evidence therein—that was dehumanizing and humiliating. We conclude, as did the trial court, that the search of defendant was a "deep intrusion" into his privacy. The trial court did not err in concluding that the search was not reasonable in scope or intensity.

We turn to defendant's challenge to the trial court's ruling that saved the contested evidence from suppression by means of the inevitable discovery doctrine. As noted, the court ruled that the search of defendant was not lawful as a search incident to arrest but that, nevertheless, the evidence from the illegal search would have been "discovered through the course of an appropriate procedure that would have been followed in jail." Evidence is inevitably discovered if it "'would have been discovered, absent the illegality, by proper and predictable investigatory procedures.'" *State v. Johnson*, 340 Or 319, 326, 131 P3d 173 (2006) (quoting *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985)). In *Johhson*, the court concluded that the taint of unlawfully obtained evidence "may be purged, thus rendering that evidence admissible." *Id.* To establish that the inevitable discovery doctrine saves the evidence from suppression, the state must show, "by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been

utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." *Miller*, 300 Or at 226.

Among defendant's arguments in his opening brief is his assertion that the policy described by Morrison at trial did not constitute a lawful administrative policy because it gives officers individual discretion as to both whom and how to search and that it is overbroad because it authorizes strip searches of anyone booked on a probation violation regardless of the circumstances. We do not address defendant's arguments, however, because we do not know which policy the jail relied on for its strip searches, and, as a result, the state has not met its burden of showing that certain proper and predictable investigatory procedures would have been used to discover the evidence at the jail. That is, the state attached as an appendix to its answering brief a redacted copy of "Corrections Division Special Order 03-25," acknowledging that the written jail policy was not offered as an exhibit at trial, asserting that Morrison "misspoke" when he referred to the policy as Special Order 03-08, and contending that Special Order 03-25 is for nondiscretionary and limited strip searches of those whom deputies have reasonable suspicion to believe are carrying or concealing contraband. In his reply brief, defendant attached unredacted copies of Special Order 03-25 *and* Special Order 03-08. He asserts that the state's argument that Morrison "misspoke" is not evidence, *see State v. Green*, 140 Or App 308, 317 n 11, 915 P2d 460 (1996) (noting that "an attorney's arguments are not evidence"), and reiterates that the state did not offer Special Order 03-25 into evidence at trial. At oral argument, the state conceded that, upon evaluating the record and defendant's arguments made in his reply brief, it is unclear which strip-search policy is at issue. Thus, acknowledging that the state has the burden of showing "certain proper and predictable investigatory procedures" would have been utilized, *Miller*, 300 Or at 226, the state also concedes that, on this record, it has not met its burden.[4]

---

[4] The state does not concede, however, that either of the strip-search policies submitted by defendant in his reply brief would have been invalid as a basis for establishing that the evidence would have been discovered under a lawful administrative search.

We agree and accept the state's concession that the evidence was not properly admitted on the basis that it would have been inevitably discovered. Therefore, because the search also was not a lawful search incident to arrest under Article I, section 9, we reverse defendant's convictions and remand for further proceedings.

Reversed and remanded.